UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CONNIE GILDERHUS,

                      Plaintiff,                      No. 08-CV-6368 CJS

    -vs-

                                           DECISION AND ORDER

CONCENTRIX CORPORATION and
SYNNEX CORPORATION,

                      Defendants.
_____

APPEARANCES

For Plaintiff:               Christina A. Agola, Esq.
                           1415 Monroe Avenue
                           Brighton, New York 14618

For Defendants:            Linda T. Prestegaard, Esq.
                           Philips Lytle LLP
                           28 East Main Street
                           1400 First Federal Plaza
                           Rochester, New York 14614

INTRODUCTION

      This is an action alleging employment discrimination and retaliation pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the New York Human Rights Law ("NYHRL"), Executive Law § 290 *et seq.* Now before the Court is Concentrix Corporation's ("Defendant") motion for summary judgment. (Docket No. [#16]).   For the reasons that follow, Defendant's application is granted and this action is dismissed.

1

BACKGROUND

Unless otherwise noted, the following are the facts of this case viewed in the light most favorable to Plaintiff.  This action arises from a five-month period in which Plaintiff was employed by Defendant Concentrix Corporation ("Concentrix").  Concentrix is a "business process outsourcing company" which provides a number of services to clients, including a telephone call center.  At all relevant times, Richard Rapach ("Rapach") was Concentrix's Vice President and General Manager, and Christopher Gelder ("Gelder") was Concentrix's Vice President of Operations.  On February 26, 2007, Rapach and Gelder hired Plaintiff to work for Concentrix as Director of Call Center Operations at Concentrix's office in Pittsford, New York.  Prior to their employment with Concentrix, Rapach and Gelder had worked with Plaintiff at another company, Sutherland Group ("Sutherland").  In fact, Gelder had previously hired Plaintiff to work at Sutherland.  Paintiff's Deposition ("Pl. Dep.") at 12.  At Sutherland, Plaintiff reported directly to Rapach, who promoted her to the position of General Manager. *Id*. at 14.  As General Manager at Sutherland, Plaintiff was responsible for a division of three-hundred employees. *Id*. at 15.  After two years at Sutherland, Plaintiff resigned on amicable terms with Gelder and Rapach, because she wanted to adopt a child. *Id*. at 15-16.

Some years later, on February 14, 2007, Gelder learned that Plaintiff was unemployed, after being laid off from her position as Director of Sales for Gerber Homes, where she had earned approximately ninety thousand dollars per year. *Id*. at 17-18.  Approximately one week after learning Plaintiff was unemployed, Gelder and Rapach hired Plaintiff to work at Concentrix.  Concentrix hired Plaintiff at an annual

salary of $85,000.00., with an indication that she would be eligible for a quarterly bonus program.  Although the terms of the bonus program were not specified in the letter of engagement which Plaintiff signed, Gelder advised her that with bonuses, her compensation would be in the range of $125.000.00 to $150,000.00. *See*, Defendant's Exhibit D, Pl. Dep. at 20-21.  According to Plaintiff, she and Gelder later agreed to a proposed bonus plan, and Gelder assured her that Rapach would eventually approve it. However, Rapach never gave it his required approval prior to the termination of Plaintiff's employment. *See*, Pl. Dep. at 21-22.  Consequently, Plaintiff did not receive a bonus during her five months of employment at Concentrix.

Gelder, Plaintiff's immediate supervisor, was hired by Concentrix in October 2006 at a starting salary of $87,000.00 per year, which was only $2,000.00 more than Plaintiff's starting salary.  Moreover, unlike Plaintiff, Gelder was not eligible to participate in any incentive bonus compensation plan. *See*, Pl. Resp. to Def.'s Local Rule 56.1 Stmt., ¶ ¶ 51, 54.

Plaintiff's predecessor in her position, David Holdridge ("Holdridge"), had been hired two years earlier, at the same starting salary as Plaintiff.[1]  Thereafter, Holdridge received a raise and stock options after one year of service, and when Concentrix was being purchased by a new parent corporation, Synnex, he received a loyalty bonus for

---

[1] Although it may seem irrelevant, since Plaintiff belatedly abandoned her Equal Pay Act claim, the fact that she was hired at the same rate of pay at which Holdridge was hired two years earlier seriously undercuts her contention that he was treated more favorably than she.  In that regard, Plaintiff admits that subsequent to Holdridge's hiring, Concentrix was sold to Synnex, which *decreased* starting pay for all new hires. *See*, Pl. Resp. to Def. Rule 56.1 Stmt. of Facts, ¶ 43 (Stating that, after the sale of Concentrix to Synnex, the new management philosophy "resulted in decreased compensation for new hires and transfers and/or promotions to the Company.").  Despite this across the board reduction, Plaintiff was still hired at the same base rate as Holdridge.

remaining with the company during the transition period. Def. Stmt. of Facts ¶ ¶ 36-41.

As a result, at the time Plaintiff was hired, Holdridge's base salary had increased to

$95,000.00.

Plaintiff worked on a number of projects during her employment with Concentrix,

but for purposes of this Decision and Order, it is sufficient to note two:  the Direct Energy

Account and the Citibank Account.  As for the Direct Energy Account, it is sufficient to

note that Plaintiff was placed in charge of "launching" a marketing program, which she

managed successfully. Pl. Dep. at 28.  In connection with such launch, Plaintiff told two

employees, Mary Pat Smith ("Smith"), a female, and Carlos Mercado ("Mercado"), a

male, that they would receive bonuses to reward them for their hard work. *Id*. at 104-

105.  The parties disagree as to whether Plaintiff was authorized to offer such bonuses

to Smith and Mercado, but again for purposes of this Decision and Order the Court

assumes that she was so authorized.  At deposition, Plaintiff initially indicated that

Rapach had refused to pay the bonuses to Smith and Mercado. *Id*. at 104 (Referring to

Smith as "one of the two supervisors denied bonuses by Dick Rapach.").  However,

Plaintiff later admitted that the bonuses had been paid. *Id*. at 107-108.  In fact, it

appears that Rapach never denied the bonuses, but merely asked for more information

before approving them. *See*, Def. Ex. Y.  In that regard, it seems that Rapach was

reluctant to pay any bonus in connection with the Direct Energy Account, because Direct

Energy had terminated the account shortly after it launched. *Id*.  In any event, Plaintiff

admits that her efforts to obtain bonuses for Smith and Mercado did not involve

allegations of discrimination, and she further admits that Concentrix did not understand

her to be complaining about discrimination. Pl. Resp. to Def.'s Local Rule 56.1 Stmt., ¶ 71.

While Plaintiff was working on the Direct Energy Account, Smith complained to her that she was not being paid what she had been promised at the time of her hire. The specific details of Smith's complaint are not in the record, but it appears that she told Plaintiff that Gelder had indicated that she would receive a raise, but it "hadn't materialized." Pl. Dep. at 109.  Plaintiff mentioned Smith's concerns to Gelder, but then had no further involvement with the issue. *Id*. at 110.  In that regard, Plaintiff states:

> I talked to Chris Gelder about it; and he, I believe, had some conversation with her about it, but I decided to step back because it was a situation between them and conversations that had occurred between them before [Smith] came to work for me [on the Direct Energy Account].

Pl. Dep. at 110.  There is no indication or even suggestion that Plaintiff made any allegations of discrimination to Gelder concerning Smith.[2]

As for the Citibank Account, Plaintiff took over the management of that account on June 12, 2007.  Prior to that, between February 2007 and June 2007, the account was managed by Alan Mogray ("Mogray"), who had the same title as Plaintiff, Director of Operations, but who earned less than Plaintiff. Pl. Dep. at 33.  Specifically, Mogray, who

---

[2]Notably, Plaintiff's deposition testimony concerning this situation involving Smith did not come up in connection with any questioning concerning retaliation.  That is, Plaintiff did not describe this incident because she was claiming she engaged in protected activity by talking to Gelder about Smith's compensation.  Instead, Plaintiff described the incident when she was asked why she had listed Smith on an interrogatory response as someone with knowledge about Plaintiff's case.  Now, however, in opposition to summary judgment, Plaintiff feebly attempts to argue that her employment was terminated in retaliation for her discussion with Gelder about Smith's compensation.  *See*, Pl. Memo of Law at 6, under the heading, "Plaintiff Engaged in Protected Activity."  However, as discussed further below, Plaintiff's conversation with Gelder on this point was clearly not protected activity under Title VII, and further, there is no indication that such conversation with Gelder had anything to do with the termination of Plaintiff's employment.

was hired one month prior to Plaintiff, earned a salary of $60,000.00, which was substantially less than Plaintiff's salary.  Moreover, Mogray, like Plaintiff, did not have an approved bonus plan, nor did he receive any bonus during the term of Plaintiff's employment.[3]  Upon being removed as Director of Operations for the Citibank Account, Mogray was demoted to the position of Data Analyst, in which he had "no accountability for operations or clients." Pl. Dep. at 34, 137-138.

Plaintiff was aware, from the beginning of her employment at Concentrix, that the Citibank Account, of which Mogray was then in charge, was "a fiasco." Pl. Dep. at 27. Plaintiff was selected to replace Mogray on the Citibank Account, which was Concentrix's second largest, because Concentrix was in danger of losing the account. *Id*. at 32, 35.  Plaintiff understood that it was her responsibility to salvage the Citibank Account. *Id*. at 36 ( "My responsibility was to turn that program around.").

The Citibank Account required Concentrix call center employees to telephone prospective customers to market Citibank's student loan consolidation loan products. Concentrix's success in that regard was measured by the number of persons who responded favorably by completing online loan applications.  Concentrix indicates that as part of its agreement with Citibank, call center employees were expected to follow a script, and were not allowed to quote loan rates over the phone.  Plaintiff understood, when she assumed control of the Citibank Account, that one of Citibank's biggest concerns was that Concentrix call center employees were improperly "quoting interest rates on the phones" to customers. *Id*. at 37-38.  In addition, Citibank was concerned

---

[3]Plaintiff admits this fact. See, Pl. Resp. to Def.'s Local Rule 56.1 Stmt., ¶ 49.

about the "performance and the skill-set of some of the [Concentrix call center employees working] on the  program." *Id*. at 38.  In short, when she assumed control of the Citibank Account, Plaintiff understood that Citibank was unhappy with the skills of the Concentrix employees who were working on the account, and was unhappy that those employees were quoting interest rates over the phone, since such quoting apparently violated banking regulations.

When Plaintiff assumed command of the Citibank Account, working directly under her was the project's Program Manager, Rae Lattau ("Lattau"), and its Account Manager, Donna Pratt ("Pratt"), both female.[4]   According to Plaintiff, Pratt was "the manager involved with the account from day one and had a personal relationship with the clients." Pl. Dep. at 82-84. In or about late July 2007, Plaintiff and Lattau then selected another employee,  Ahmad Abdussamad ("Abdussamad"), to supervise the call center employees, who numbered approximately twenty. Pl. Dep. at 41-44.

Plaintiff attempted to improve the Citibank Account's operation by having Citibank re-train the call center employees. Pl. Dep. at 45-48, 51.  In addition, Plaintiff created performance improvement plans for the seven worst-performing call center employees. *Id*. at 48.  Subsequently, one of those employees quit the program, and the other was fired.  Of the five remaining employees on performance improvement plans, three met the goals of their plans, while two did not. Pl. Dep. at 74-76.  As for the two employees who did not meet their performance improvement goals, Plaintiff decided, toward the

---

[4]Plaintiff sought and obtained direct control over the account, in keeping with her view of her role. In that regard, she asked Gelder, who had previously  exercised a supervisory role over the account, to step back, and even to move his office away from the call center, which he did. *See*, Pl. Dep. at 59-60. Plaintiff also directed that all communications with Citibank were to go through her. *Id*. at 58.  In addition, she directed Lattau to "push back" whenever Gelder tried to involve himself with the program. *Id*. at 60.

end of July 2007, to place them on a "second and final action plan." Plaintiff did this for

a number of reasons, including that they had only recently been re-trained, and that

performance of the program overall was improving. *Id*. On this point, Plaintiff maintains

that the Citibank Account showed improvement in June and July, based on the number

of customers making online loan applications, though Citibank questioned how many of

those applications were obtained through Concentrix's efforts. *Id*. at 49, 52-53.

However, Citibank disagreed with Plaintiff's decision to have any of the five employees

continue working on the Citibank Account. *Id*. at 77 ("[T]hey had concerns about my

decision to allow these five agents to remain on the program. They did not want them to

remain on the program."). Despite Citibank's disagreement, Plaintiff believed that it was

her duty to not allow Citibank to dictate who worked on the account:

> It is not uncommon in this industry that clients will try to dictate which
> employees remain on their programs and which ones don't, and it is our
> responsibility to make sure they don't do that. They [the five employees]
> are Concentrix employees, and as I said earlier, I felt a responsibility to
> make sure they were treated fairly.

Pl. Dep. at 76. Plaintiff vaguely maintains that she notified Gelder that Citibank wanted

the five employees removed from the account. *See, id.* at 88. Nevertheless, Plaintiff

agrees that, "[i]n a client review meeting at the end of July 2007, [she] assured Mr.

Rapach and Mr. Gelder that the Citibank student loan program results were improving

and that the client was happy." *See*, Pl. Resp. to Def.'s Local Rule 56.1 Statement ¶ 15

(Indicating that Rapach and Gelder's version of events on this point is "uncontested.").[5]

---

[5] Plaintiff apparently believed that Citibank was sufficiently "happy" overall, despite its
unhappiness over the five employees on performance improvement plans, since the number of esigns
had increased. *See, e.g.*, [#16-2] Def. Ex. J ("The focus was on increasing esigns, per Gelder.").

8

On July 23, 2007,  in connection with an account unrelated to the Citibank Account, Gelder informed Plaintiff that two of the supervisors working under her, a male and a female, were caught using the company's instant messaging system to carry on an adulterous consensual sexual relationship.  Gelder was angry about the employees' conduct and wanted to fire them, but he permitted Plaintiff to handle the problem since the employees were "under [her] jurisdiction." Pl. Dep. at 68.  Plaintiff investigated, and then suspended the two supervisors for two weeks, for misuse of company time and property. *Id*. at 69-72.   There is no indication that Gelder or Rapach had any objection to Plaintiff's handling of the situation.

As mentioned earlier, Citibank was unhappy about Plaintiff's decision to keep five underperforming employees on the Citibank Account.  Toward the end of July 2007, Citibank indicated that it wanted to audit the telephone calls of those five employees.

> Q. And what did Citibank say about the monitoring se[ssion] and why this one was more significant?
>
> A. This one was they had concerns about my decision to allow these five agents to remain on the program.  They did not want them to remain on the program.

Pl. Dep. at 77; *see also, id*. at 78-79.  Citibank indicated that during the upcoming call monitoring session, it wanted to focus attention on calls handled by the aforementioned five employees. *Id*.  Gelder was copied in on Citibank's email.

Plaintiff knew that she would not be at work on the day of the scheduled call monitoring session with Citibank representatives, because of a prior personal

commitment.[6] *Id*. at 78.  She further indicates that she would not ordinarily have

attended the session in any event, and that she entrusted Lattau and Pratt with

attending such sessions. *See*, Pl. Local Rule 56.1 Stmt., ¶ ¶ 81, 87.[7]  Unfortunately,

Lattau was also scheduled to  be out of the office on the day of the call monitoring

session.  Pl. Dep. at 82.  Consequently, Lattau arranged to have Pratt and the newly-

promoted Abdussamad attend the call audit.  At deposition, Plaintiff indicated that, prior

to the call monitoring session, she expressly told Lattau to "be careful in the calls we

chose for the client to monitor," and that Lattau told her that, although she would be out

of the office that day, she "had listened to the calls with [Abdussamad].  There were no

fatal errors." *Id*. at 82-83.[8]  However, during the monitoring session, the Citibank

representatives heard one of the Concentrix agents commit what the parties refer to as a

"fatal error," in terms of what they said to the potential customer over the phone. *Id*. at

84.  Notably, the error was made by one of the employees that Plaintiff had placed on a

second performance improvement plan, rather than removing him from the account as

Citibank had requested.  Upon hearing the mistakes made by the Concentrix employee,

the Citibank representatives became "irate" and threatened to terminate the account. *Id*.

---

[6]Plaintiff's brother had recently died, and Plaintiff, as the nominated executor of his will,  had scheduled an appointment to meet with the estate attorney on the same day as the monitoring session.

[7]In opposition to Defendant's motion, Plaintiff indicates that it was not her responsibility to attend the monitoring session.  Instead, she states that her "job responsibilities on the Citibank project was [sic] to make sure that client objectives were being met, that the program manager had the support she needed, to oversee the day-to-day operations." Pl. Resp. to Def.'s Rule 56.1 Stmt., ¶ 17.

[8]Although the Court does not resolve issues of credibility on a summary judgment motion, it notes that in an email written only days after the monitoring session and termination of her employment, Plaintiff did not indicate that Lattau had told her that she had listened to the calls.  Instead, Plaintiff appears to indicate that she merely assumed that Lattau had done so. *See*, Defendant's Exhibits, Ex. J ("I don't fault Rae [Lattau] entirely, I only thought she listened to the recordings before leaving.  She was pinched for time & it may have slipped.").

at 84 ("[T]he client was irate and felt, once again, that Concentrix was putting them at risk.").

On the day following the monitoring session, Friday, August 3, 2007, Plaintiff and Lattau were called to a meeting with Rapach and Gelder to discuss the situation, and to try to find a way to salvage the account. *Id*. at 86.[9]  The following week, Rapach and Gelder met with Citibank to attempt to smooth over the problem, but Citibank nevertheless terminated its contract with Concentrix. *See, id*. at 90-92; *id*. at 91 ("The plan was to beg for forgiveness and please don't pull the plug[.]").  As noted earlier, the Citibank account had been Concentrix's second largest account.

Almost immediately thereafter, on August 7, 2007, Gelder terminated Plaintiff's employment.   In that regard, Plaintiff states that Gelder had tears in his eyes, hugged her, and said, "Connie, you know how this place is.  What I want you to do is leave here, find a job, and hire me." *Id*. at 93.  In addition to Plaintiff, eight other employees were terminated by Concentrix as a result of the loss of the Citibank Account.  Of those eight employees, two were female and six were male. See, Def. Ex. G.   As far as it appears from the record, neither Lattau nor Pratt was terminated or disciplined.  Abdussamad also was not terminated, though he was demoted from Supervisor to Sales Representative and placed within another group at Concentrix. J. Cooper Deposition at 36-37.  Mogray, who had no involvement with the Citibank Account after Plaintiff assumed control of it, was not disciplined as a result of the loss of the account, though,

---

[9]In a proposed action plan to address the problem, Plaintiff changed her position and recommended that the two employees that she had placed on second and final performance improvement plans be removed from the Citibank Account. *See*, Pl. Exs. Vol. II, Ex. J.

11

as noted earlier, he was previously removed from the account and demoted.

Subsequently, Plaintiff wrote various email messages concerning the events that led to the termination of her employment. *See*, Def. Exs. H-J.  On August 7, 2007, Plaintiff wrote, in pertinent part:  "I was relieved of my role at Concentrix today.  Can't say as I'm surprised, someone had to take the fall for the loss of a major account like Citibank." Def. Ex. H.  On August 8, 2007, Plaintiff wrote:

> I won't pull you into the events that occurred yesterday, but I am asking if you can insist on conducting a root cause analysis of the fatal errors that lead to the loss of the Citibank program.  I am more than willing to take accountability for my actions & I am guilty of making a poor judgment call, however, there are more severe systemic problems that lead to the final events. . . .  Good luck as you continue to educate the leaders of Concentrix who will continually choose to implement "Band-Aid solutions" and then hold Ops Managers accountable for clients terminating programs.  I only hope you are able to hear ALL accounts of what lead to the demise of this program other than the fatal errors I made in Judgment.[10]

*Id.* at Exs. H & I.  On August 12, 2007, Plaintiff wrote, in pertinent part:

> Synnex [Concentrix's parent company] was not happy to say the least at the loss of the Citibank program.  I believe my termination was a knee-jerk reaction to Caldwell's scrutiny!  I took over Citibank as you know in June & was barely there in July.  The focus was on increasing esigns per Gelder.  We demonstrated a 20% increase June to July, however during a monitoring session last week, Patty uncovered a fatal error that put CB [Citibank] at too much risk & they terminated the program.  It started with my email to Dea/Patty saying that 7 agents were put on action plans effective 7/1.  At the end of the month, I told them that 3 were being eliminated, 2 met requirements of action plan & 2 demonstrated significant improvement & were being put on 2nd & final action plan for Aug.  The fatal error was made by one of the two allowed to remain on a 2nd action plan & they went nuts!  Questioned the management of the program.  Unfortunately, when I went out in July it delayed the promotion of Ahmad &

---

[10]This email message appears in both Defendant's Exhibits H and I, but the last sentence is not included in Exhibit H.

so no one was conducting proper monitoring & coaching to inspect for these types of errors.  So although, we increased performance, we weren't focused on quality per Dick Rapach . . . .  and I was ultimately accountable for the loss of a major account.  The question becomes of course, why is Mogray still there?  He screwed the thing up from Feb to June & Gelder made some bad calls too, but I take the hit when I was only on the program for a few short weeks & still trying to recover from a tragic loss???? [referring to her brother's sudden death in early July] Unbelievable!  I will admit to my mistakes and bad calls in judgment, but the 48 hours surrounding this were unbelievable  & I was focused on managing things for Gayle & Dan who were experiencing traumatic events as well!  Rae [Lattau] assured me Ahmad could handle [the] monitoring session & I should have been there.  Bad call on my part.  I don't fault Rae entirely, I only thought she listened to the recordings before leaving.  She was pinched for time & it may have slipped.  They [Citibank] wanted to listen to the calls of the ones being allowed to remain [the employees on performance improvement plans], I should have been on top of it at that point & known to be careful on what calls we pulled!  Chris [Gelder] asked why I reported on the action plans & results [to Citibank]  & I told him it was to assure them that we were on top of the non-performers with a plan in place to turn it around & we did which is why esign performance went up 20%.

Def. Ex. J.

Plaintiff's position at Concentrix remained vacant for seven months, after which Concentrix promoted Daniel Sheehan ("Sheehan"), a male, to the position of Director of Operations.  Sheehan's starting salary was $70,000.00 per year, which was $15,000.00 less than Plaintiff's salary.  Sheehan was eligible for bonuses, but even assuming that he met all bonus requirements, he could not have earned more than Plaintiff's base salary. *See*, Pl. Resp. to Def.'s Rule 56.1 Stmt., ¶ ¶ 55-56.

On November 5, 2007, with the assistance of her current attorney, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC").  The complaint alleges that Plaintiff was discriminated against, because her employment was

13

terminated while "males who performed worse than [she] did" were not terminated. Pl.

Exs., Vol II, Ex. A.  The EEOC complaint further alleges that Plaintiff was retaliated

against, after she "reported unpaid bonuses to members of a protected class

(female/Italian-American)" and after she "engaged I the course of a sexual harassment

investigation as the investigator." *Id*.  The Court observes that the complaint's reference

to a "sexual harassment investigation" is erroneous, since the matter which Plaintiff

investigated did not involve sexual harassment, but instead, involved a violation of the

company's code of conduct and misuse of company property.[11]

---

[11] At deposition, Plaintiff indicated that she had "a great deal of HR [human resources] training in the areas of sexual harassment, managing within the EEOC guidelines, recruiting, terminating employees, managing performance, creating action plans." Pl. Dep. at 11.  However, it does not appear that this situation, involving a consensual relationship between a  male supervisor and a female supervisor, involved sexual harassment.  Rather, according to Plaintiff's own deposition testimony, the issue was the misuse of company time and property. *See*, Pl. Dep. at 70-71 (Indicating that the situation "related to misuse of company equipment, unprofessional conduct based on our guidelines.").  Neither of the parties involved complained of sexual harassment, and the issue only came to light because it was discovered that they were misusing the company's instant messaging to have inappropriate conversations.  Consequently, Plaintiff's counsel's reference to this incident as "sexual harassment," in both her complaints to the EEOC and in this action, in an apparent attempt to bolster the retaliation claim by making it appear that Plaintiff somehow engaged in protected activity covered by Title VII, is a false misrepresentation of the facts of this case. *See, e.g.*, Plaintiff's Local Rule 56.1 Statement, p. 12 ("Plaintiff Asked to Conduct Sexual Harassment Investigation"); see also, Pl. Response to Defs. Local Rule 56.1 Stmt., ¶ 74 (Indicating that Plaintiff is relying on this incident to support her retaliation claim); EEOC Complaint (Stating that she was retaliated against after she "engaged in the course of a *sexual harassment investigation* as the investigator.") (emphasis added).  The Court does not believe that counsel's misleading use of the term "sexual harassment" was inadvertent, since she made a similar argument in another Title VII case that was recently before the Court. *See, Male v. Tops Markets*, LLC, 2011 WL 2471449 at *10 & n. 19 (W.D.N.Y. Jun. 22, 2011).  In addition, Plaintiff's counsel continues to insist that Gelder and Mogray "had bonus incentive plans," despite having no evidence of that, and despite conceding elsewhere in her papers that they did not have such bonus plans. *See*, Pl. Rule 56.1 Stmt. ¶ 98; Pl. Resp. to Def. Rule 56.1 Stmt., ¶ ¶ 6, 49, 51, 60. (The inconsistencies on this point alone in Plaintiff's papers again cause the Court to wonder who is preparing Plaintiff's counsel's papers, and whether they are bothering to read them before filing them with this Court. *See, Rojas v. Roman Catholic Diocese or Rochester*, 783 F.Supp.2d 381, footnote  20 (W.D.N.Y. 2010)).  Plaintiff's counsel has previously been warned by this Court, on numerous occasions, against making such misrepresentations to the Court, but apparently those warnings continue to be ignored. *See, Rojas v. Roman Catholic Diocese of Rochester*, — F.3d —, 2011 WL 4552460 at * n. 8 (2d Cir. Oct. 4, 2011) ("We note that the District Court has been compelled to warn the law firm that represented Rojas about making improper and unsupported factual representations to the court on several occasions, both prior and subsequent to this decision in this case.") (citing five decisions and orders by this Court).

On August 15, 2008, Plaintiff commenced this action.[12]  Plaintiff purports to assert claims under Title VII and the NYHRL, for disparate treatment discrimination on the basis of sex, and retaliation.[13]  At deposition, Plaintiff was asked to explain how Concentrix discriminated against her, and she gave the following response:

Q. How have you been discriminated against?

A. The Citibank account was managed by Alan Mogray for four months.  I had it for six weeks.  Chris Gelder managed the Citibank account the entire time.[14]  The entire four months that, that program was managed by Alan Mogray, not once was [sic] any of those agents put on an action plan.  There was no supervisor put in place.  There were many fatal mistakes made in managing that program.  So the fact that there were two males and one female involved in the overall management of that program and I was the only one terminated suggests discrimination.

Q. Any other basis for your claim of discrimination?

A. The fact that other male managers, such as David Holdridge, my predecessor, Chris Gelder, Alan Mogray, all had bonus plans.[15]  Concentrix from day one was in breach of my contract by never providing me a bonus plan and never giving me an opportunity to earn a bonus.

Q. Anything else?

A. No.

---

[12]In the interim, Plaintiff filed an EEOC complaint, which was later dismissed and a right-to-sue letter issued.

[13]Plaintiff also asserted a claim pursuant to the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), but withdrew that claim after Concentrix filed its summary judgment motion.

[14]As noted above, Plaintiff indicated that upon assuming control of the Citibank program, she told Gelder, her supervisor, to step back from his supervision of the program and move his office away from the call center operations.

[15]As discussed above, this assertion is demonstrably false, but Plaintiff and her attorney have continued to maintain it throughout this action.

15

Pl. Dep. at 93-94.  Plaintiff further indicated that she was not paid as well as men at

Concentrix:

> David Holdridge made a higher base salary than I; and with regards to
> compensation in general, the bonus plans, as I stated earlier, I believe the
> other gentlemen had bonus plans and I did not, with opportunity to earn
> bonus and in some cases did earn bonus.

*Id*. at 151.

Following the completion of discovery, Defendant filed the subject motion for

summary judgment.  As for the disparate-treatment sex discrimination claim, Defendant

contends that Plaintiff cannot demonstrate a prima facie case, since she has not shown

that she was a satisfactory employee or that the termination of her employment occurred

under circumstances giving rise to an inference of discrimination.  Alternatively,

Defendant indicates that it had a non-discriminatory reason for terminating Plaintiff's

employment, which was her failure to properly manage the Citibank Account. *See*, Def.

Memo of Law at 1 ("Plaintiff's employment . . . was terminated . . . as a result of [her]

failure to properly prepare her team for a crucial audit, and failure to keep the

Company's management aware of critical performance issues.").  As for the retaliation

claim, Defendant also contends that Plaintiff cannot establish a prima facie case, since

she did not engage in protected activity, and since there is no causal nexus between any

such activity and the termination of her employment.  In support of the motion,

Defendant has submitted affidavits from Rapach and Gelder, both of whom indicate that,

at a client review meeting at the end of July 2007, Plaintiff told them that the Citibank

Account "performance and results were improving and that the client was happy."

Rapach Aff. ¶ 11, Gelder Aff. at ¶ 12.   They further indicate that they were quite

16

surprised on August 3, 2007, when Citibank informed them that it was terminating its account with Concentrix, and that it had been telling Plaintiff "for some time that Citibank was unhappy." Rapach Aff. at ¶ 14.  They maintain that as a result, they concluded that Plaintiff had not been forthcoming about the problems with the account, and that it was appropriate to terminate her employment. Rapach Aff. at ¶ 14; Gelder Aff. at ¶ 19 ("[Plaintiff's] failure to report the true performance of the Citibank student loan program to me made me concerned.  I felt that she was hiding information.").  Both Rapach and Gelder indicate that the decision to terminate Plaintiff's employment had nothing to do with her sex, and that she never complained about discrimination. *See*, Gelder Aff. at ¶ 26.

In opposition, Plaintiff states that she was qualified for her position, and that her firing occurred under circumstances suggesting discriminatory animus, since Mogray and Abdussamad, both of whom are male, were treated more favorably, and since she was replaced by a male, Sheehan.  She further states that the reason given for terminating her employment is false, because she improved the Citibank Account, after Mogray had mismanaged it, and because she kept Gelder informed of the status of the account.  As  for her retaliation claim, Plaintiff states that she engaged in protected activity by pursuing a bonus for Smith, and by telling Gelder of Smith's complaint that she was not being paid at her agreed upon rate.  She also indicates that she has established a causal nexus between the protected activity and the termination of her employment, since she was terminated shortly after the protected activity.  In addition, she contends that she has shown that Defendant's stated reason for firing her is false and pretextual, for the reasons already discussed above.

In support of her opposition, Plaintiff has submitted affidavits from herself, Mary Pat Vitelli ("Vitelli")[16], Mercado, Joellen Cooper ("Cooper"), Christine Gambacorta ("Gambacorta"),  and E. Flinn Hackett ("Hackett").  Most of the content of these affidavits is irrelevant or otherwise inadmissible, and unhelpful to Plaintiff.  For example, Cooper, a former co-worker at Concentrix who commiserated with Plaintiff by email following her termination, states that she disagrees with the decision to terminate Plaintiff, but admits that Rapach "made a business decision.  It was not atypical or even unreasonable for there to be a termination attached to the loss of a major account." Cooper Aff. at ¶ 26. Cooper further states, "It was my observation that [Plaintiff's] role dictated that she bear ultimate responsibility for all accounts, but there was very little tenure on this one, and probably too short a time to have been effective in turning it around." *Id*. at ¶ 21. Gambacorta, who worked at Concentrix, suggests that Plaintiff's termination was not due to her performance, but instead, was because "[s]he was handed 'poorly performing' programs and not provided the appropriate amount of time or the support to effectively turn them around." Gambacorta Aff. ¶ 9.  Vitelli, another former Concentrix employee, with an obvious axe to grind against Rapach, complains that he did not greet her in the mornings, "didn't have a good grasp on what was happening," "rarely interacted" with the women on his team, "had a good old boys attitude," lied to clients, and "had a 'better than you' attitude." Vitelli Aff. at ¶ ¶ 6, 12, 16.  As for Gelder, Vitelli offers that he "was more about his own self interests, at the expense of doing what was right." *Id*. at ¶ 17. On the other hand, Vitelli gushes that Plaintiff was "direct, honest, fair, " "a high quality

---

[16] It appears that Mary Pat Vitelli may be the same person as Mary Pat Smith, though her affidavit does not indicate that.

manager . . . driven by procedure and ethics," who was "respected and well liked by her peers." Id. at ¶ 19.  Vitelli states that she had a discussion with Gelder about "salary inequitites between male and female managers," and that Gelder agreed that she was earning less than less qualified males, but that Rapach would not approve a raise. *Id*. at ¶ 9.[17]  Notably, Vitelli was only employed by Concentrix until May 2007, when she was laid off following the demise of the Direct Energy Account, and therefore she has no firsthand knowledge about the specific events concerning the Citibank Account that led to the termination of Plaintiff's employment. *Id*. at ¶ ¶ 2, 38.  Nevertheless, Vitelli ventures to opine that, "Knowing the inner workings of the Concentrix Corporation, I am confident that the failure of the Citibank program was not the fault of Connie Gilderhus." *Id*. at ¶ 45.  Hackett's affidavit indicates that Plaintiff previously worked with him at the Sutherland Group, but he has no personal knowledge about her employment at Concentrix or the facts of this case. Hackett Aff. at ¶ ¶  19, 24.  As for Mercado, he indicates that Concentrix fired Plaintiff because she refused Citibank's request to remove the underperforming employees from its account:

> I believe that Connie was defending the performance of certain staff to Citibank, who wanted these individuals immediately terminated.  Connie however, did not believe that this was the proper way of dealing with these employees.  She, as she always did, attempted to do the right thing.  She felt that these employees were still adjusting to the training confusion and that they should be provided additional training and be closely monitored.[18] She felt that they were worth saving.  So she refused to terminate these

---

[17]Even assuming that Vitelli and Smith are the same person, which, again, Plaintiff has not indicated, Vitelli does not say that she related this alleged conversation with Gelder to Plaintiff. Moreover, there is no indication whatsoever that Plaintiff made any claim of discrimination on Vitelli's behalf, or that this issue had anything to do with the termination of Plaintiff's employment.

[18]Plaintiff admitted, in an email written after she was fired, that these employees were not closely monitored, as they should have been.

employees at Citibank's request.  This is why I believe Concentrix targeted Connie Gilderhus for termination.

Mercado Aff. ¶ ¶ 32-34.

On October 13, 2011, counsel for the parties appeared before the undersigned for oral argument. Steven Laprade, Esq. appeared of counsel for Plaintiff's counsel's firm.

ANALYSIS

*Rule 56*

Summary  judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v.*

20

*Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question.  Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted).  Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829 (1985).

*Title VII*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006). It is well settled that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629, n.1 (2d Cir. 1997), *cert den*. 522 U.S. 997 (1997). Consequently, unless otherwise noted, references to Title VII herein are also intended to refer to the NYHRL.

With these general legal principles in mind, the Court will proceed to consider Plaintiff's claims.

*Disparate Treatment*

Disparate treatment discrimination claims are analyzed using the well-settled *McDonnell Douglas*[19] burden-shifting framework:

> A plaintiff establishes a prima facie case of discrimination by showing that he or she (1) is a member of a protected [group] . . . .; (2) was qualified to perform the duties required by the position; (3) was subjected to an adverse employment action; and (4) the adverse employment action occurred in circumstances that gave rise to an inference of discrimination. *See Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).
>
> ***

---

[19] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

22

Once the plaintiff presents a prima facie case[20], the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon the defendant's articulation of a legitimate, non-discriminatory reason, the presumption of discrimination arising from the plaintiff's prima facie showing " 'drops out of the picture,' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir.2000), and the burden of production shifts back to the plaintiff to adduce evidence sufficient for a reasonable jury to conclude that discrimination was a reason for the employment action, *see Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000). In deciding a motion for summary judgment, the court is to examine "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Id.* at 90 (*quoting Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Thus, summary judgment is appropriate when the plaintiff "has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor" in the defendant's employment decision. *Schnabel*, 232 F.3d at 91.

*Butts v. NYC Dept. of Housing Preservation and Dev.*, No. 07-1930-cv, 307 Fed.Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. Jan. 28, 2009); *see also, Terry v. Ashcroft*, 336 F.3d at 138 ("[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.") (citations and internal quotations omitted).

In this case, Defendant maintains that Plaintiff cannot satisfy two elements of a prima facie case, namely, that she was qualified for her position, or that she was

---

[20] "A plaintiff's burden of establishing a *prima facie* case is *de minimis*.  The requirement is neither onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 467 (citations and internal quotation marks omitted).

terminated under circumstances giving rise to an inference of sex-based discrimination. As for the first of these,

> the cases . . . indicate that in order to satisfy the minimal burden of proof for a prima facie case, a plaintiff need show only that [s]he possessed the basic skills necessary to continue [her] employment; occurrence of any misbehavior, these cases indicate, is more appropriately evaluated in the context of whether defendant's termination of plaintiff's employment was somehow impermissibly affected by [her sex].

*Murray v. U.S. Dept. of Justice*, 821 F.Supp. 94, 104 (E.D.N.Y. 1993), *affirmed*, 14 F.3d 591 (2d Cir. 1993) (table); *see also, De la Cruz v. New York City Human Resources Admin. Dept. of Social Services*, 82 F.3d 16, 20 (2d Cir. 1996) ("To satisfy the second element of the test, de la Cruz need not demonstrate that his performance was flawless or superior. Rather, he need only demonstrate that he possesses the basic skills necessary for performance of the job.") (citations and internal quotation marks omitted). Here, Plaintiff has at least made a prima facie showing that she possessed the basic skills necessary to continue her employment, and accordingly, the Court finds that she has satisfied that element of her prima facie case.

As for the last element of her prima facie case, Plaintiff contends that she was terminated under circumstances giving rise to an inference of discrimination because she was replaced by a male, Sheehan. Defendant disagrees, but given the low threshold necessary to establish a prima facie case, the Court will assume that Plaintiff satisfies this element, even though Sheehan was hired many months later at a significantly lower salary.

Nevertheless, Defendant is still entitled to summary judgment, since it has come forward with a non-discriminatory reason for firing Plaintiff, and she has not shown that

24

the reason is false, or that the real motive was discriminatory animus.  On this point,

assuming that a plaintiff establishes a prima facie case, and that the defendant provides

a non-discriminatory reason for the employment action, at the third tier of the *McDonnell*

*Douglas* test, the plaintiff is required "to produce sufficient evidence to support a rational

finding that the non-discriminatory business reasons proffered by the defendant for the

challenged employment actions were false." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239

F.3d at 470.  If the plaintiff succeeds, such evidence may, or may not, establish the

additional required proof of discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated,
> and proof that "the employer's proffered reason is unpersuasive, or even
> obviously contrived, does not necessarily establish that the plaintiff's
> proffered reason is correct.  In other words, it is not enough to disbelieve
> the employer; the factfinder must believe the plaintiff's explanation of
> intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v.*

*Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)).  "The relevant

factors . . . include the strength of the plaintiff's prima facie case, the probative value of

the proof that the employer's explanation is false, and any other evidence that supports

or undermines the employer's case." *Id*. (internal quotation marks omitted).

Here, Defendant indicates that it terminated Plaintiff's employment because her

mistakes led to the loss of the Citibank Account, and because she failed to keep Gelder

and/or Rapach advised about Citibank's unhappiness over her handling of the account.

Of course, as discussed above, immediately after she was let go, Plaintiff admitted that

she had made "fatal errors in judgment" and "poor judgment calls," and that she "was

ultimately accountable for the loss of a major account."  Nevertheless, she now

maintains that the decision to fire her was discriminatory, because Gelder, Mogray, and Abdussamad were not also fired.  In this regard, it is worth reiterating that Lattau and Pratt, who are female, and who unlike Mogray or Gelder were directly involved in the disastrous call audit, were not fired.  However, even ignoring Lattau and Pratt, the fact that Gelder, Mogray, and Abdussamad were not fired does not suggest that Plaintiff was terminated because of her sex.  Rather, as she admits, she was the person ultimately responsible for the Citibank Account, and she had been put in charge of the account specifically to prevent the loss of the account, which she failed to do.  Nor, was the loss of the account inevitable, as Plaintiff seems to suggest.  Instead, the loss of the account occurred for the very reason about which Plaintiff was briefed when she took over the account:  Citibank's dissatisfaction with the skill of the call center employees, including the fact that they were improperly giving out interest rate information over the phone.  Furthermore, the disastrous call audit occurred as a direct result of Plaintiff's decision to deny Citibank's request to remove five underperforming employees from the account.  Neither Gelder, Mogray, nor Abdussamad made that decision.

Alternatively, Plaintiff denies that she failed to keep Gelder and Rapach advised of Citibank's dissatisfaction with the mistakes being made by call center employees, as Concentrix maintains. On this point, she cites to her deposition testimony, in which she indicates that she told Gelder that Citibank wanted the five employees removed from the account.  At the same time, though, she admits that, "[i]in a client review meeting at the end of July 2007, [she] assured Mr. Rapach and Mr. Gelder that the Citibank student loan program results were improving and that the client was happy." See, Pl. Resp. to Def.'s Rule 56.1 Stmt., ¶ 15.  However, Rapach and Gelder indicate that when Citibank

26

pulled its account, it told them that it had been voicing its dissatisfaction to Plaintiff for quite some time. *See*, Rapach Aff. at ¶ 14; Gelder Aff. at ¶ ¶ 17-18.  Plaintiff has no evidence to refute that this is what Citibank told Rapach and Gelder.  Nevertheless, she contends that Gelder and Rapach could not have been surprised by Citibank's decision to fire Concentrix, as they claim. See, Pl. Resp. to Def's Rule 56.1 Stmt., ¶ 21.  In that regard, she seems to argue that Rapach and Gelder must have known the extent to which Citibank was upset about her decision to keep the five underperforming employees on the Citibank Account, because Gelder "had regular communications with the client," and because "Gelder and Rapach were duly copied on emails notifying them of the client's reluctance to keep the five remaining agents and the client's desire to have a monitoring session of those agents." *Id*. at ¶ 21.[21]  Plaintiff, though, has failed to show that Rapach's and Gelder's purported belief that Plaintiff was not sufficiently forthcoming about the extent of the problem was not a basis for their decision to terminate her employment.

Moreover, the decision to terminate Plaintiff's employment was made by Rapach and Gelder, who had hired Plaintiff only six months earlier, at a salary almost equal to Gelder's, presumably because they had a favorable impression of her abilities from having previously worked with her. *See, Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.") (citation and internal

---

[21] It does not appear that Rapach was copied in on the email concerning the phone call audit. *Id*.

27

quotation marks omitted).  There is no indication that Rapach or Gelder had any

personal animus toward Plaintiff at all, much less discriminatory animus.  Accordingly,

for all of the foregoing reasons, Plaintiff has not shown that the reasons which

Concentrix has given for terminating her employment are false, or that the real reason

was discrimination.

*Retaliation*

Title VII retaliation claims are also analyzed using the *McDonnell Douglas* three-

tier burden-shifting test discussed above. *Valentine v.Standard & Poors*, 50 F.Supp.2d

262, 281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d

1327 (2d Cir. 2000).

> "Retaliation claims under Title VII are evaluated under a three-step
> burden-shifting analysis." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d
> 166, 173 (2d Cir.2005); *see also McDonnell Douglas Corp. v. Green*, 411
> U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  First, the plaintiff
> must establish a prima facie case of retaliation by showing: " '(1)
> participation in a protected activity; (2) that the defendant knew of the
> protected activity; (3) an adverse employment action; and (4) a causal
> connection between the protected activity and the adverse employment
> action.' " *Jute*, 420 F.3d at 173 (*quoting McMenemy v. City of Rochester*,
> 241 F.3d 279, 282-83 (2d Cir.2001)). The plaintiff's burden in this regard is
> " de minimis," and "the court's role in evaluating a summary judgment
> request is to determine only whether proffered admissible evidence would
> be sufficient to permit a rational finder of fact to infer a retaliatory motive."
> *Id*. (internal quotation marks omitted).
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation
> arises." *Id*. The defendant must then "articulate a legitimate, non-retaliatory
> reason for the adverse employment action." *Id*. If so, "the presumption of
> retaliation dissipates and the employee must show that retaliation was a
> substantial reason for the adverse employment action." *Id*. A plaintiff can
> sustain this burden by proving that "a retaliatory motive played a part in the
> adverse employment actions even if it was not the sole cause[;] if the
> employer was motivated by retaliatory animus, Title VII is violated even if
> there were objectively valid grounds for the [adverse employment action]."

*Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990).

*Hicks v. Baines*, 593 F.3d 159, 164-165 (2d Cir. 2010).

It is well settled that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d cir. 2000).  In deciding whether a particular activity amounts to "protected activity," "the employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII.  Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001).  Significantly, for purposes of this case, "implicit in the requirement that the employer have been aware of the protected activity is the requirement that it understood, or could reasonably have understood, that the plaintiff's [complaint] was directed at conduct prohibited by Title VII." *Galdieri-Ambrosini v. National Realty & Development Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

In the instant case, Defendant maintains that Plaintiff cannot establish a prima facie case of retaliation, because she did not engage in protected activity.  Although the standard for a prima facie case is low, the Court agrees that Plaintiff cannot show that she engaged in protected activity.  More specifically, Plaintiff did not engage in protected activity under Title VII when she asked that bonuses be paid to a male employee and a female employee for their work on a failed project, where she admits that she gave no indication that she was complaining of discrimination.  Further, Plaintiff did not engage in protected activity under Title VII when she mentioned to Gelder that Smith was unhappy

29

with her pay, where again, she gave no indication that she was complaining about discrimination.  Moreover, Plaintiff did not engage in protected activity under Title VII when she investigated and disciplined a male supervisor and a female supervisor for misusing company time and property by using the company computers to carry on a consensual sexual relationship.[22]

Even assuming, *arguendo*, that Plaintiff had engaged in protected activity, and that she could satisfy the causation element based merely on the temporal proximity between the protected activity and the termination of her employment, Defendant would still be entitled to summary judgment, for the reasons already discussed above.  That is, Defendant has come forward with non-discriminatory reasons for terminating Plaintiff's employment, and she has not come forward with sufficient evidentiary proof in admissible form to create a triable issue of fact as to whether those reasons are false, or whether a real reason for Defendant's decision was retaliatory animus.

CONCLUSION

For the foregoing reasons, Defendant's summary judgment motion [#16] is

---

[22] Even if the situation had involved "sexual harassment," Plaintiff's investigation and handling of the situation in her supervisory role would not qualify as protected activity. *See, Ezuma v. City Univ. of New York*, 665 F.Supp.2d 116, 122-124 (E.D.N.Y. 2009) ("[I]f an academic chairperson is required as part of his job to report incidents of sexual harassment that come to his attention, as is the case here, the mere performance of that function is not "opposition" to his employer and does not constitute protected activity."); *id*. at 129 ("[P]laintiff must oppose discrimination, rather than simply report it as part of his job, to have a retaliation claim."), *aff'd*, 367 Fed.Appx. 178 (2d Cir. Feb. 22, 2010) (table); *see also, Adams v. Northstar Location Servs., LLC*, No. 09–CV–1063–JTC, 2010 WL 3911415 at *4 (W.D.N.Y. Oct. 5, 2010) ("[P]laintiff's actions in investigating the complaint of race-based harassment would not constitute protected activity, as plaintiff was acting in the scope of her employment as a human resources director by interviewing the witnesses to the incident.").

30

granted and this action is dismissed.[23]

        SO ORDERED.

Dated: Rochester, New York
        October 19, 2011

                                        ENTER:


                                        /s/ Charles J. Siragusa
                                        CHARLES J. SIRAGUSA
                                        United States District Judge

---

[23]The action is dismissed in its entirety, as against Concentrix and Synnex.  In that regard, Concentrix indicates that Synnex was never properly served in this action. Plaintiff does not directly refute that assertion, but nevertheless appears to argue that Synnex is liable as an employer in this action. *See*, Pl. Response to Defendant's Rule 56. 1 Statement, ¶ 2.  The Court finds that Synnex was not served in this action, and in that regard, notes that the only proof of service that was filed in this action indicates that the summons and complaint were served on Ms. Christine Tam, who is employed as Director of Human Resources at Concentrix, which is identified by Plaintiff as a wholly owned subsidiary of Synnex. *See, Sansui Electronics Corp. v. American Southern Ins. Co.*, 1992 WL 77591 at *4 (S.D.N.Y. Mar. 26, 1992) ("It is hornbook law that service of process on a subsidiary does not constitute service on a parent corporation, nor does service on a parent constitute service on the subsidiary. Except in exceptional circumstances not present here, the law respects separate corporate identities even where one corporation may wholly own another....") (citations omitted).   In an any event, even assuming that Synnex had been served, there is no basis for liability against Synnex, for the same reasons discussed above pertaining to Concentrix.